# EXHIBIT A

## SOX COMPLAINT

## SARBANES-OXLEY COMPLAINT OF JOHN BURNS

1. I, John Burns, reside at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Bradenton, Florida 34211. My telephone number is (941)737-0723.

2. I am making this complaint pursuant to The Sarbanes-Oxley Act of 2002, as amended, 18 U.S.C. § 1514A.

3. I worked for Medtronic, Inc. (hereafter "Medtronic") starting June of 2000 to May 2, 2014. Medtronic is publicly traded on the NYSE under the ticker symbol "MDT."

4. I have worked as both a Clinical Specialist and a Sales Representative, with most of my tenure spent living in and servicing Bradenton, Florida. Medtronic's world headquarters are located at 710 Medtronic Parkway, LS 100, Minneapolis, Minnesota 55432-5604. Its phone number is (800) 633-8766.

5. Medtronic develops and manufactures medical device technology and therapies. Medtronic sells products to hospitals and doctors, marketing products as reimbursable by Medicare, Medicaid and other Federal health care programs.

6. During the time I worked for Medtronic, it has been subject to several Corporate Integrity Agreements with the Office of Inspector General (OIG) of the United States Department of Health and Human Services (HHS) as a condition of settling several *qui tam* lawsuits brought by the United States. The most recent Corporate Integrity Agreement (CIA) became effective May 31, 2009 for a five-year period terminating May 31, 2014. The CIA requires that Medtronic promote compliance by its officers, directors, employees, contractors, and agents with the statutes, regulations and written directives of Medicare, Medicaid, and all other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) (Federal health care program requirements).

    a. Under the CIA, Medtronic is required to make promotion and adherence to a Code of Conduct an element in evaluating the performance of all employees. The Code of Conduct includes at a minimum:

        i. Medtronic's commitment to full compliance with all federal, state, and local laws and regulations (which includes Federal health care program requirements);

        ii. Medtronic's requirement that all Covered Persons shall be expected to comply with all Federal health care program requirements and with Medtronic's own Policies and Procedures as implemented pursuant to the CIA;

        iii. the requirement that all persons covered by the CIA shall report to their Compliance Officer, or other appropriate individuals designated by Medtronic, suspected violations of any Federal health care program requirements or of Medtronic's own Policies and Procedures;

    iv.  the possible consequences to Medtronic and persons covered by the CIA for failure to comply with all Federal health care program requirements and with Medtronic and its subsidiaries' Policies and Procedures and the failure to report such non-compliance; and

    v.  the right of all individuals to use the Disclosure Program and Medtronic's commitment to non-retaliation and to maintain, as appropriate, confidentiality and anonymity with respect to such disclosures.

b.  Each person covered by the CIA is also required to certify in writing or electronically that he or she has received, read, understood and shall abide by Medtronic's Code of Conduct.

c.  Under the CIA, Medtronic is also required to implement written Policies and Procedures regarding the operation of Medtronic's compliance programs and their compliance with Federal health care requirements. At a minimum, the Policies and Procedures must address:

    i.  subjects relating to the Code of Conduct;

    ii.  the expectation that persons covered under the CIA shall comply with the Code of Conduct, and the Policies and Procedures required by the CIA;

    iii.  42 U.S.C. § 1320a-7b(b) (Anti-Kickback Statute) and the regulations and other guidance documents related to this statute, and business or financial arrangements or contracts that may violate the Anti-Kickback Statute, and the applicability of the Anti-Kickback Statute to Arrangements as the term is defined within the CIA.

d.  Medtronic also stipulated to financial penalties for specified breaches, and acknowledged that what constitutes a material breach of the CIA is within the discretion of the OIG.

7.  As an employee of Medtronic, I was required to undergo frequent trainings on ethical practices. Each year, I completed Medtronic's ethics and code training form, and, for the past three years, I reported that illegal practices were occurring within my sales environment. However, I was never contacted by an investigator and the practices continued.

8.  During my employment at Medtronic, I learned that reports of legal and ethical violations made using the Voice Your Concern hotline are not confidential, and complaining to Human Resources about legal and ethical violations inevitably leads to separation from employment.

9.  In practice, Medtronic did not actually want for its employees to report illegal activities to Medtronic's Legal Department, as instructed in the Code of Conduct. My District Manager of Southwest Florida, Mr. Neal Horne, discussed with the sales team that asking the legal department questions could only cause trouble and Mr. Horne instructed us to address questions to him directly, as a member of the Southwest Florida Team recently asked Legal if it was permissible for him to conduct (illegal) transcription services for customers.

10. In January of 2013, I learned that a competitor was beginning to market a product to Medtronic's customers that had not yet been approved by the Food and Drug Administration, violating Federal law. I reported this illegality to my managers, Mr. Horne and Vice President of Florida Sales, Mike Mathias, and stated that I did not know how I could legally compete with the competitor's offer to sell a cutting edge product that was not yet approved for sale.

11. Mr. Horne and Mr. Mathias responded that I needed to perform the same sales practices as my co-workers, Sales Representatives Jesse Turcott and Brian Haworth, to maintain the customer relationship and the business. These practices included:

   a. Ethically and legally prohibited activities regarding entertaining Physician customers, and performing valuable services for Physicians for free with the intent of gaining business;

   b. Improperly expensing meals, entertainment, and services in an effort to hide ethical and legal violations; and

   c. Billing processes and document creation, resulting in Medicaid and Medicare fraud.

12. Throughout 2013, I told Mr. Horne and Mr. Mathias that I opposed these practices in order to retain business. The items above breached Medtronic's CIA with the United States as well as:

   a. The False Claims Act ("FCA") 31 U.S.C. §§ 3729 – 3733 provides, in pertinent part, that:

      (a) Any person who
         (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
         (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
         (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government;. . . or
         (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government, or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

   b. The Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b. Criminal penalties for acts involving Federal health care programs.

(a) Making or causing to be made false statements or representations. Whoever—

    (1) knowingly and willfully makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program (as defined in subsection (f)),

    (2) at any time knowingly and willfully makes or causes to be made any false statement or representation of a material fact for use in determining rights to such benefit or payment,

    (3) having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment, or (B) the initial or continued right to any such benefit or payment of any other individual in whose behalf he has applied for or is receiving such benefit or payment, conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized,

    (4) having made application to receive any such benefit or payment for the use and benefit of another and having received it, knowingly and willfully converts such benefit or payment or any part thereof to a use other than for the use and benefit of such other person,

    (5) presents or causes to be presented a claim for a physician's service for which payment may be made under a Federal health care program and knows that the individual who furnished the service was not licensed as a physician, or

    (6) for a fee knowingly and willfully counsels or assists an individual to dispose of assets (including by any transfer in trust) in order for the individual to become eligible for medical assistance under a State plan under title XIX [42 USCS §§ 1396 et seq.], if disposing of the assets results in the imposition of a period of ineligibility for such assistance under section 1917(c) [42 USCS § 1396p(c)], shall

        (i) in the case of such a statement, representation, concealment, failure, or conversion by any other person in connection with the furnishing (by that person) of items or services for which payment is or may be made under the pro-gram, be guilty of a felony and upon conviction thereof fined not more than $ 25,000 or imprisoned for not more than five years or both, or

        (ii) in the case of such a statement, representation, concealment, failure, conversion, or provision of counsel or assistance by any other person, be guilty of a misdemeanor and upon conviction thereof fined not more than $ 10,000 or imprisoned for not more than one year, or both.

(b) Illegal remunerations.

    (1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

        (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment

may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $ 25,000 or imprisoned for not more than five years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $ 25,000 or imprisoned for not more than five years, or both.

c. The Physician Payments Sunshine Act, 42 CFR Parts 402 and 403, Medicare, Medicaid, Children's Health Insurance Programs; Transparency Reports and Reporting of Physician Ownership or Investment Interests.

§403.904 Reports of payments or other transfers of value to covered recipients.

*General rule.* (1) Direct and indirect payments or other transfers of value provided by an applicable manufacturer to a covered recipient during the preceding calendar year, and direct and indirect payments or other transfers of value provided to a third party at the request of or designated by the applicable manufacturer on behalf of a covered recipient during the preceding calendar year, must be reported by the applicable manufacturer to CMS on an CMS basis.

§ 403.912 Penalties for failure to report.

(c) Knowing failure to report.

(1) Any applicable manufacturer or applicable group purchasing organization that knowingly fails to timely, accurately or completely report the information required in accordance with the rules established under this subpart is subject to a civil monetary penalty of not less than $10,000, but not more than $100,000, for each payment or other transfer of value or ownership or investment interest not reported timely, accurately, or completely.

(2) The total amount of civil monetary penalties imposed on each applicable manufacturer or group purchasing organization (regardless of whether the applicable manufacturer was a part of a

consolidated report) with respect to knowing failures to report in an annual submission of information will not exceed $1,000,000.

13. In October of 2013, Mr. Horne met with me to discuss my sales numbers, which had decreased due to the Manatee County Hospital deal lost to my competitor's unethical and illegal practices. In my 13.5 years with Medtronic, I had previously received higher annual numbers but also received lower annual numbers, without penalty or disciplinary action. I told Mr. Horne that the territory had not permanently shrunk, and that the business would become available again once the competitor's unlawful deal ran its course. I explained again that I would not "do whatever it takes" like my co-workers did by paying for doctors to go on fishing trips, buying gifts for doctors, providing valuable services to doctors at no charge, concealing prohibited expenses, and other practices I opposed that were expected by management and performed by my team.

14. Although a performance improvement plan is a standard practice for underperforming sales representatives, Mr. Horne instead presented me with an option for a new, demoted position within Medtronic, framing it as an absorption and restructure, and stating that another team member, Mr. Turcott, was affected the same way. Mr. Horne later informed me that the new position was no longer optional, and was a result of my opposition to do whatever it takes to maintain customer relationships. I subsequently learned that Mr. Turcott was instead being promoted and taking over my accounts effective Q4.

15. Starting in October of 2013, management excluded me from team meetings, relationship-building events with customers, receiving training materials for Sales Representatives, and assigned other Sales Representatives to call on my customers.

16. On November 21, 2013, at a district meeting in Sarasota, Mr. Haworth said that he, Mr. Mathias and Mr. Horne took one of my accounts out to dinner without my knowledge.

17. On November 25, 2013, at the next sales meeting, Mr. Horne said the circumstances had changed and that my only option was to quit or take a demotion to the Clinical Specialist position.

18. On November 26, 2013, I received an email while on vacation with attached documents explaining my demoted position and decreased compensation.

19. Because I was being faced with a forced demotion or termination, I sought assistance from an attorney. On January 27, 2014, my attorney sent a letter to Medtronic, explaining that I had engaged in protected activity because I opposed violations of law and ethical requirements, and as a result I was being subjected to retaliation in the form of a demotion.

20. On January 29, 2014, I learned that Mr. Haworth and Mr. Turcott were calling on my accounts.

21. From February 2014 onward I made sure to input calls and appointments on a shared calendar in order to provide notice to everyone that I was performing tasks as assigned. Other

representatives continued to call on my accounts and told customers/physicians that I was in the process of being replaced.

22. On February 21, 2014, I received an email invitation to an investigative interview with Medtronic's Ethics and Compliance Officer Christina Rich to occur on February 25, 2014. Breaching Medtronic's CIA, this reporting and interview was not kept confidential: Mr. Horne and Mr. Mathias, two of the people I had reported for violations, were included on the email invitation.

23. On February 24, 2014, at their request, I met with Mr. Horne and District Service Manager Clayton DeSantis at a Bob Evans restaurant to discuss "roles and responsibilities." Mr. Horne and Mr. DeSantis told me that I was stepping on Mr. Turcott's toes and they falsely accused me of improperly coordinating with co-workers.

    a. During this meeting, I inquired why Mr. Haworth and Mr. Turcott were splitting my territory as team representatives and why I was the one being demoted and pushed out, noting that I have been employed with Medtronic 13.5 years, have the most certifications, and that Mr. Turcott and Mr. Haworth do not have the accomplishments that I have. Additionally, Mr. Turcott did not reach his sales goals for the previous year. Mr. Horne and Mr. DeSantis did not answer me.

24. On February 25, 2014, Ms. Rich interviewed me via telephone in response to my reports of legal and ethical violations. My managers and co-workers had knowledge of this interview, although my understanding was that the investigation process was supposed to be confidential pursuant to the CIA. During the interview, I mentioned several documents substantiating my claims and submitted them thereafter.

25. On February 27, 2014, I sat at home because I had not received any assignments. This was a very unusual occurrence. Unlike other Sales Representatives and Clinical Specialists, I was not allowed to attend the LINQ product launch that I had put forth a lot of effort to promote. In the last quarter, I grew the old product 600% in preparation for the new product launch yet was not permitted to attend the launch.

26. On February 28, 2014, I learned that Mr. Horne had accused me of insubordination. I was not insubordinate to Mr. Horne, and I had not been accused of insubordination before.

27. On March 1, 2014, I emailed Ms. Rich, stating that I believed I was being retaliated against because Mr. Horne falsely accused me of insubordination and because Medtronic had not provided me with any work assignments.

28. On March 3, 2014, Medtronic officially demoted me to Clinical Specialist, and Mr. DeSantis became my new supervisor. I soon learned that I was not allowed to call on any customers in Bradenton unless I was directed to do so by Mr. Haworth, Mr. Turcott, Mr. DeSantis or Mr. Horne. Mr. DeSantis also instructed me that my new position required floating throughout the region, but that I was not permitted to perform any work activities in or for customers in Bradenton, Florida.

29. On March 7, 2014, Ms. Rich emailed me asking for more pictures/documents that I mentioned during the February 25, 2014 interview. I provided the additional information in my possession that I had obtained from co-workers' Facebook accounts. While confirming whether additional pictures were available on Facebook, I noticed that Mr. Haworth had blocked me from viewing his Facebook account.

30. As of March 21, 2014, I noticed that my managers and co-workers had almost entirely stopped communicating with me. My only way of knowing my assignments was by checking the salesforce calendar for updates.

31. On April 5, 2014, I learned that I was falsely accused of putting derogatory stickers about a St. Jude representative on cars and/or giving the stickers to doctors. These accusations were false and could not be substantiated. Medtronic later decided not to pursue these allegations against me. At about the same time, Mr. DeSantis told me that I was no longer permitted to expense my licensure renewal or continuing education although this was something I had done in the past. Mr. DeSantis told me that if I was permitted to expense a box of ballpoint pens, I had to promise not to give them as gifts to customers. Expensing office supplies like paper and pens had never been an issue in the past.

32. Medtronic and I agreed that I would be placed on a non-disciplinary leave from work from April 15, 2014 through April 25, 2014. Medtronic told me not to perform any work duties during this leave from work.

33. On April 22, 2014, representatives of Medtronic (in-house counsel Reuben Mjaanes, Mr. Horne, and Mr. Mathias) met with my attorneys and me to discuss the complaints I had raised against Medtronic.

34. I returned to work on Saturday, April 26, 2014, and was available for on-call work starting Friday, April 25th at 5 pm.

35. On or about April 30, 2014, Medtronic issued a disciplinary action to me for allegedly being "noncompliant," which I dispute. The incident for which I was allegedly noncompliant took place during the time I was on leave from work with Medtronic and had been told not to perform any work duties.

36. On May 2, 2014, Mr. DeSantis notified me Medtronic terminated my employment. Mr. DeSantis said that the reason for my termination was that I was noncompliant. I believe Medtronic terminated my employment in an act of unlawful retaliation as proscribed by The Sarbanes-Oxley Act of 2002.

Please investigate my complaint and feel free to contact me in order that I may be interviewed and provide any additional information, documentation or available witnesses and affidavits in order to substantiate my complaint.

_(signature)_
John Burns

_5/22/14_
Date

I affirm that I have read this nine-page complaint and that it is true to the best of my knowledge, information and belief.

_(signature)_
John Burns

_5/22/14_
Date

STATE OF _Florida_
COUNTY OF _Manatee_

BEFORE ME, the undersigned authority, personally appeared John Burns, who is personally known to me or who has produced _Florida Drivers License_ as identification.

SWORN TO and Subscribed before me this _22_ day of _May_ , 2014.

x _(signature)_
Notary Public, State of Florida at Large
Printed Name: _IRENE ROSARIO_
My Commission Expires: _NOVEMBER 13, 2017_
My Commission Number: _FF 70302_

_(notary seal:)_
IRENE ROSARIO
NOTARY
My Comm. Expires
November 13, 2017
No. FF 70302
STATE OF FLORIDA
PUBLIC

## Complainant Information

*(Please notify this office immediately of any change)*

| | |
|---|---|
| Name: | John D. Burns |
| Address: | |
| | Bradenton, FL 34211 |
| Telephone #: | (941)737-0723 |
| E-mail: | keeppaced@tampabay.rr.com |

Respondent Information:

| | |
|---|---|
| Company Name: | Medtronic, Inc. |
| Address: | 710 Medtronic Parkway, LS 100, |
| | Minneapolis, MN 55432-5604 |
| Individual Respondents: | Neal Horne, District Manager of Southwest Florida |
| | Mike Mathias, Vice President of Florida Sales |
| | Clayton DeSantis, District Service Manager |
| Company Representative: | Reuben A. Mjaanes |
| | Principal Legal Counsel |
| | Medtronic, Inc. |
| Contact Office Tel. #: | (763)505-2578 |
| Contact Fax #: | (763)505-2976 |
| Contact Email: | reuben.mjaanes@medtronic.com |

1. **How many employees worked with you at this company or job site?** Approx. 4,500

2. **What kind of business is this? (e.g., manufacturer, construction, shipping, transportation, agriculture, etc…)** Medtronic, Inc. develops, manufactures and sells medical devices and therapies.

3. **Do you belong to a union?** **Circle One:** Yes No

4. **What was the first date of your employment?** 06/05/2000

5. **What was the last date of employment (if applicable)?**    05/02/2014

6. **What was your job title?**       Sales Representative and later Clinical Specialist

7. **Briefly describe your duties and responsibilities.**    Develop and maintain a customer base. Product promotion, sales, technical support, as well as product demonstrations and trainings. Provided assistance to sales representatives.

8. **What type of adverse action was taken against you? (e.g., termination, suspension, layoff, etc…)** Medtronic harassed, retaliated against, and disparaged me.  Medtronic significantly reduced my responsibilities and demoted me. Less than two months later, Medtronic terminated my employment.

9. **What was your final wage rate?**  $111,800 per year, which was a substantial decrease compared to my income as a Sales Representative.

10. **What was the date of this adverse action?**  Medtronic took the adverse actions against me over a period of time; Medtronic provided notice of termination and actually terminated my employment on 5/2/2014.

11. **What was the average number of hours that you worked per week?**    50+

12. **What is the name and job title of your immediate supervisor?**
Neal Horne, District Manager of Southwest Florida; then Clayton DeSantis, District Service Manager

13. **In your opinion, *why* did your employer take adverse action against you?**
I refused to perform and participate in activities that violated laws and ethics. I also formally complained and reported the violations and retaliation.

14. **Do you have a copy of anything in writing regarding the termination, layoff, etc…?**
Circle One:  |YES|      NO

15. Did you make any complaints to your employer? Circle One: YES   NO

16.      What did you complain about? I complained that Medtronic was retaliating against me because I did not perform and participate in illegal and unethical acts, and because I reported said violations.

17. Whom did you complain to?

Name:       Neal Horne, District Manager of Southwest Florida;

Mike Mathias, Vice President of Florida Sales;

Christina Rich, Vice President of Ethics and Compliance;

Reuben Mjaanes, Medtronic in-house counsel

18. When was your most recent complaint made?       05/02/2014

19. Did anyone else hear you complain to your employer?   Circle One:   YES   NO

If so, what is this person's name and telephone number?

Brian Haworth, Jesse Turcott, Nancy Cedola, among others. They can all be contacted through Medtronic, Inc.

20. Have you filed for Unemployment or filed an appeal for Unemployment?

Circle One:   YES   NO

21. What would you like OSHA to do for you?

Ensure that Medtronic does not retaliate against others in the future the way they retaliated against me.  Intimidating employees so that they fear they will lose their livelihood if they report unlawful and unethical information threatens the financial well-being of the company and, in this case, threatens public health and safety.  I would also like to be made whole for all financial losses I have suffered as a result of Medtronic's retaliation against me, including lost wages and benefits, compensatory damages, and attorneys' fees and costs.  Compensatory damages would compensate me for Medtronic's damage to my reputation, along with the embarrassment, humiliation, and emotional distress Medtronic caused my family and me.

22. If your employment was terminated are you interested in returning to work for your previous employer?

Circle One:   YES   NO

## Witnesses

Names and telephone numbers of witnesses who can support your claim:

| WITNESS NAME | ADDRESS | PHONE NUMBER (W/ AREA CODE) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |