## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JOHN BURNS,

      Plaintiff,

v.                           Case No.  8:15-cv-2330-T17-TBM

MEDTRONIC, INC.;
NEAL HORNE, individually;
MIKE MATHIAS, individually; and
CLAYTON DESANTIS, individually,

      Defendants.

---

## PLAINTIFF'S AMENDED OPPOSITION TO
## DEFENDANTS' JOINT AMENDED MOTION FOR SUMMARY JUDGMENT

Plaintiff John Burns, through undersigned counsel and pursuant to Middle District of

Florida Local Rule 3.01(b), opposes *Defendants' Joint Amended Motion for Summary*

*Judgment and Incorporated Memorandum of Law* (Defendants' "Motion") (Dkts. 99-107). For

the reasons discussed more thoroughly below, this Court should deny Defendants' Motion in

all respects.

### MEMORANDUM OF LAW IN SUPPORT

**I.      The Record Supports Burns' SOX Claim**

To establish a SOX retaliation claim, a plaintiff must prove that: 1) he engaged in

protected activity; 2) the employer knew or suspected he engaged in protected activity; 3) he

suffered an unfavorable personnel action; and 4) the protected activity was a contributing factor

in the unfavorable action. Johnson v. Stein Mart, Inc., 440 Fed. App'x. 795, 2011 WL 3962819

(11th Cir. 2011) (citation omitted). Defendants argue that Burns' retaliation claim fails as a

matter of law because he failed to establish that he engaged in protected activity and, to the extent that he did, that he failed to establish that his protected activity was a contributing factor in the decision to demote and/or terminate him. (Dkt. 99 at 4-13). Further, Defendants dispute any knowledge of Burns' protected activity prior to January 27, 2014; however, they concede that they were aware of Burns' alleged protected activity after that date. (Dkt. 99 at 8).

**A.      There is a genuine issue of material fact regarding whether Burns engaged in protected activity under SOX.**

For Burns to receive protection under SOX, at the time he reported the alleged unlawful conduct, he must have had a subjectively and objectively reasonable belief that Defendants violated a federal law related to fraud against shareholders. Rhinehimer v. U.S. Bancorp Investments, Inc., 787 F.3d 797, 810 (6th Cir. 2015). "The subjective component is satisfied if the employee actually believed that the conduct complained of constituted a violation of relevant law." Id. "'Objective reasonableness is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee.'"; Wallace v. Tesoro Corp., 796 F.3d 468, 475 (5th Cir. 2015); Gale v. U.S. Dept. of Labor, 384 Fed. Appx. 926 (11th Cir. 2010).

Defendants argue it is undisputed that Burns did not have a subjectively or objectively reasonable belief because Burns testified that he did not believe that the conduct he complained about would cause Medtronic to lose its Medicare contracts, significantly impact Medtronic's financial stability or directly affect the shareholders. (Dkt. 99, at pp. 5-7, p. 4 fn. 1). Defendants concluded that this testimony is an admission by Burns that he did not actually (subjectively) believe that Medtronic's shareholders would be defrauded by the misconduct he reported. (Id.). However, Defendants mischaracterize Burns' testimony. (Dkt. 99 at 6-7). He was never asked

this question nor opined in his deposition testimony that the shareholders would not be defrauded by Medtronic's actions. Even still, the inquiry is not whether what he complained about would have, actually did or will directly affect the shareholders. Instead, Burns must only show that he reasonably believed what he complained of violated federal law. Murray v. UBS Securities, LLC, Case No. 14 Civ 927 (KPF), 2017 WL 1498051 (S.D.N.Y. Apr. 25, 2017) quoting Nielson v. AECOM Technology Corp., 762 F.3d 214, 224 (2d Cir. 2014) (quotation omitted). As the illegal practices Burns objected constitute fraud (i.e. Medicare fraud and kickback violations), this sufficiently relates to a fraud on the shareholders. Id. Further, Burns' testimony does not establish that he actually believed the conduct complained of was lawful.[1]

Contrary to Defendants' argument, the record evidence supports that Burns both subjectively and objectively believed that the conduct to which he reported and/or complained violated federal laws relating to a fraud on the shareholders. Prior to making his reports, Burns was aware of Medtronic's prior troubles in 2008 with Medicare fraud that resulted in a $75 million settlement and culminated in Medtronic being placed under a five-year Corporate Integrity Agreement ("CIA") with the government. (Dkt. 113-8, Corp. Rep. Rich 8:8-9:25; 91:11-23; Burns Decl.). In fact, pursuant to the CIA, Medtronic had to train its employees to identify fraud, such as illegal kickback practices and Medicare billing fraud. (Kersey Decl. Ex. 1 at MEDTRONIC 000066; Kersey Decl. Ex. 2 at pp. 21-23; Burns Decl.).[2] Burns participated and completed that training and made clear that he believed that the conduct he complained of

---

[1] Further, whether the government would decide to take action against Medtronic is not relevant to the standard under SOX.

[2] Pursuant to Plaintiff's motion filed June 16, 2017 (Dkt. 112), Plaintiff will confer with Defendants regarding the filing of all supporting exhibits (herein designated as "Kersey Decl. Ex. #").

violated federal law based on the training Medtronic provided him. (Dkt. 113-1, Burns 7:24-9:13; 10:13-13:4; 14:16-15:1; 105:5-109:11; Kersey Decl. Ex. 3 at No. 1; Kersey Decl. Ex. 4 at No. 9). Further, Burns had independent knowledge of competitors in Medtronic's industry having settled similar allegations of kickback charges for practices similar to those Burns reported and believed to be occurring. (Burns Decl.). Burns also sought an independent opinion from the Advanced Medical Technology Association as to the illegal practices he observed, who confirmed his subjective belief that the practices violated federal anti-kickback and other laws. (Burns Decl.).   Thus, Medtronic's conduct, if proven, related to a fraud on the shareholders.

In addition, the fact that Medtronic investigated Burns' allegations and issued discipline to another employee as a result of that investigation indicates that Medtronic believed that Burns' allegations were subjectively reasonable. <u>See</u> Kersey Decl. Exs. 5, 6 & 7; <u>Collins v. Beazer Homes USA, Inc.</u>, 334 F. Supp. 2d 1365, 1377-78 (N.D. Ga. 2004) (citing The Sarbanes-Oxley Act of 2002, Cong. Rec. S7418, S7420 (daily ed. July 26, 2002), available at 2002 WL 32054527 ("Certainly, although not exclusively, any type of corporate or agency action taken based on the information, or the information constituting admissible evidence at any later proceeding would be strong indicia that it could support such a reasonable belief."). Thus, there is sufficient evidence in the record for the trier of fact to conclude that Burns' belief was subjectively reasonable and Defendants' Motion should be denied.

Moreover, Plaintiff's beliefs were objectively reasonable because if the activities to which he objected to and/or refused to participate in proved true, such activities appear to be illegal, and could have constituted a fraud on Medtronic's shareholders. <u>See U.S. ex rel.</u>

<u>Hutcheson v. Blackstone Medical, Inc.</u>, 647 F.3d 377 (1st Cir. 2011) (allegations that a medical company paid physicians kickbacks in the form of exorbitant and illicit entertainment expenses, among other practices, stated a claim for a violation of the Anti-Kickback Statute);[3] <u>U.S. ex rel. Armfield, III v. Gills</u>, No. 8:07-cv-2374-T-27TBM (M.D. Fla. 2010) citing <u>U.S. ex rel Clausen v. Laboratory Corporation of America, Inc.</u>, 290 F.3d 1301 (11th Cir. 2002) (seeking reimbursement from Medicare for services that were not rendered as billed, including where the provider did not perform or supervise the services claimed, constitutes a false claim, which "is '*sine qua non*' of a False Claims Act violation."). Defendants' Motion should be denied because there is sufficient evidence in the record for the trier of fact to conclude that Burns' sufficiently engaged in protected activity because his beliefs were both subjectively and objectively reasonable.

**B.      There is a genuine issue of material fact regarding whether Burns reported alleged unlawful conduct before January 27, 2014.**

Defendants argue that Burns did not report any alleged unlawful conduct before January 27, 2014, because Burns certified in 2014 compliance documents that he did not make any reports and testified that he never reported anything through the Voice Your Concern Hotline. (Dkt. 99 at 8-9; Dkt. 113-1, Burns 165:23-167:15).

While Burns did not make any reports directly to Medtronic's compliance department prior to January 2014, Burns testified that he did in fact complain to his supervisors about the unlawful entertainment practices and superbilling issues prior to notice of his demotion. (Dkt.

---

[3] <u>See also</u> <u>United States ex rel. Kroening v. Forest Pharm., Inc.</u>, No. 12-CV-366, 2016 WL 75066, at *6 (E.D. Wis. Jan. 6, 2016) ("If a pharmaceutical company knowingly and willfully pays or offers to pay any remuneration to a physician in exchange for the physician prescribing a particular product, it violates the Anti-Kickback Statute.").

113-1, Burns 311:12-19); Kersey Decl. Ex. 3 at No. 1; Kersey Decl. Ex. 4 at No. 9; Burns

Decl.). That is all that is required to engage in protected activity under SOX. 18 U.S.C. §

1514A(a)(1)(C) (an employee is protected when providing information "to…a person with

supervisory authority over the employee or such other person working for the employer who

has the authority to investigate, discover, or terminate misconduct").

Thus, the record evidence supports that a dispute of fact remains as to whether Burns

engaged in protected activity prior to January 2014 and summary judgment must be denied.

**C.     There is no dispute that Defendants were aware of Burns' protected activity after
         January 2014.**

There is no dispute that Defendants were aware of Burns' allegedly protected activity

*after* January 27, 2014 and during Medtronic's investigation of Burns' complaints in February

2014. (Kersey Decl. Ex. 18, 19 & 20; Burns Decl.).

**D.     There is a genuine issue of material fact as to whether Burns' reports of alleged
         unlawful conduct were a contributing factor to his demotion and termination.**

A "contributing factor" is "any factor, which alone or in combination with other factors,

tends to affect *in any way* the outcome of the decision." Lockheed Martin Corp. v. Admin.

Review Bd., U.S. Dep't of Labor, 717 F.3d 1121, 1136 (10th Cir. 2013) (citing Klopfenstein

v. PCC Flow Techs. Holdings, Inc., No. 04–149, 2006 WL 3246904, at *13 (ARB, May 31,

2006) (emphasis in original). The contributing factor standard "is broad and forgiving." Id.

Notably, "the required showing to establish causation for a claimant under [SOX] is less

onerous than the showing required under" other federal anti-retaliation laws. Id. at 1137.

Under this standard, "[t]he plaintiff need not show that protected activity was a

significant, motivating, substantial, or predominant factor in the adverse personnel action; 'but

rather may prevail by showing that the [defendant's] reason, while true, is only one of the reasons for its conduct, and another [contributing] factor is the complainant's protected activity." Wallender v. Canadian Natl. Ry. Co., 2:13-CV-2603-DKV, 2015 WL 10818741, at *20 (W.D. Tenn. Feb. 10, 2015) (citing Bechtel v. Competitive Techs., Inc., ARB Case No. 09–052, 2011 WL 4889269, at *7 (Dep't of Labor Sept. 30, 2011) (citations omitted). "[T]he determination of whether the complainant has met his burden under SOX of proving 'contributing factor' causation does not involve the weighing of the respondent's evidence of lawful, non-retaliatory reasons for its actions." Id. However, proof that Burns' protected activity was a contributing factor may be shown through "temporal proximity, indications of pretext, inconsistent application of an employer's policies, shifting explanations for an employer's actions, and more." Id.

1.   **There is a genuine issue of material fact as to whether Burns' protected activity was a contributing factor to his demotion.**

There is sufficient evidence for a reasonable fact finder to conclude that Burns' protected activity was a contributing factor in the decision to demote him to a Clinical Specialist position—namely, indicia of pretext and comparator evidence. Specifically, Defendants claims that the basis for Burns' demotion was that his allegedly declining sales no longer supported a full-time sales representative and that there were customer complaints.

i.   **Pretext.** Defendants' stated reasons are pretextual.

*Burns' Sales.* The record evidence casts doubt that declining sales were a legitimate reason for Burns' demotion. For example, Horne claimed that Burns' numbers began to decline in 2012, but at the end of 2012, Burns was one of the top Sales Reps in the entire country. (Kersey Decl. Ex. 8 at ¶3; Burns Decl.). Burns also received multiple awards for his good

performance. (Burns Decl.).

Further, when Horne informed Burns about the demotion to the Clinical Specialist role, he told Burns that his sales revenue no longer supported his territory and that the territory "no longer exists." (Kersey Decl. Ex. 8 at pp. 7-8). But that turned out not to be true either because Horne then assigned Jesse Turcott to Burns' territory. (Dkt. 113-5, Horne 97:1-12; 100:18-101:10).

*Customer Complaints.* Another basis Defendants claim they demoted Burns to the Clinical Specialist position was because of alleged complaints from physician customers. (Dkt. 99 at p. 2). For instance, Horne stated that Dr. Jeffrey Rothfeld complained about Burns. (Kersey Decl. Ex. 8 at ¶5; Dkt. 113-5, Horne 50:24-51:6; 51:20-52:3; 78:8-79:6). However, Dr. Rothfeld denied ever complaining about Burns, said he was not aware of anyone at his practice complaining about Burns, and that in his opinion, Burns was "[p]robably the most effective sales rep in the area." (Dkt. 113-11, Rothfeld 32:22-25; 33:15; 44:13-18). Dr. Rothfeld even went as far as to write Burns a letter of recommendation when Medtronic fired him. (Kersey Decl. Ex. 9). Thus, the record evidence suggests that Horne made up the complaints by Dr. Rothfeld to fabricate a post hoc justification for Burns' demotion.

Defendants also misrepresented or mischaracterized incidents with Drs. Rivera and Subbiondo to create reasons to demote Burns after the fact.[4] (Dkt. 113-1, Burns 22:23-26:24; Burns Decl.). Notably, one of the alleged complaints Defendants rely on for the basis of demotion happened back in or around 2010; yet Medtronic, Horne nor Mike Mathias

---

[4] These complaints are inadmissible hearsay and should not be considered. Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999) (citing general rule that inadmissible hearsay cannot be considered on a motion for summary judgment).

previously counseled Burns about this alleged complaint or even made Burns aware of the complaint. As for the alleged complaint involving Dr. Subbiondo, not only is it inadmissible hearsay, but again, neither Horne nor Mathias, the two management officials who allegedly received this complaint, investigated the complaint nor made Burns aware of the complaint at any time before he was notified of his demotion.  (Burns Decl.).

        **ii.**     **Comparator Evidence.** Moreover, Jesse Turcott had consistently low sales for several years and Defendants did not similarly attempt to demote Turcott. Rather, it rewarded him by giving him Burns' territory. (Kersey Decl. Ex. 4; Dkt. 113-5, Horne 97:1-12; 100:18-101:10).

        Further, even if Defendants' stated reasons were true, based on this broad and forgiving standard, sufficient evidence remains for the trier of fact to conclude that Burns' reports of suspected illegal conduct were a contributing factor to his demotion. <u>Wallender</u>, 2015 WL 10818741, at *20.

        **2.**     **There is a genuine issue of material fact as to whether Burns' protected activity was a contributing factor to his termination.**

        **i.**     **Temporal Proximity.** There was a concerted effort to get rid of Burns in close temporal proximity after he reported and objected to suspected illegal practices to Medtronic's general counsel on January 27, 2014, and again in Medtronic's investigation on February 25, 2014. Christina Rich investigated and interviewed Burns as part of that investigation on February 25, 2014, in which Burns again engaged in protected activity.

        Less than five months after reporting the suspected illegal activities to Medtronic's counsel and less than four months again reporting and objecting to those same practices as part of Medtronic's investigation of same, Defendants terminated Burns.  <u>Wiest v. Lynch</u>, 15 F.

Supp. 3d 543, 562 (E.D. Pa. 2014) (citing Zinn v. Am. Commercial Lines, Inc., ARB. No. 10-029, 2012 WL 1143309 (Dep't of Labor Mar. 28, 2012) ("[A] temporal proximity of seven to eight months between protected activity and adverse action may be sufficient circumstantial evidence to prove that the protected activity contributed to the adverse action.")).

        **ii.**    **Retaliatory Animus.** The record evidence demonstrates that Horne and Clayton DeSantis harbored a retaliatory animus toward Burns after he engaged in protected activity. Specifically, Horne and DeSantis exchanged text conversations immediately following interviews by Rich of Burns' allegations that a reasonable fact finder could infer that Burns' protected activity contributed to his termination.[5] For example, on March 4, 2014, just a week or so *after* Rich interviewed Burns, Horne texted DeSantis to inquire how his meeting with Burns to discuss Burns' new Clinical Specialist role went:

| DeSantis: | "Like my new best friend. I made him say he understood about 6 times" |
|---|---|
| Horne: | "**Serious? Fuck! That means he is going to try to make it hard on us.** How about the canceled vacation?" |
| DeSantis: | "He is not going anywhere" |

(Kersey Decl. Ex. 10 at pp. 7-8) (emphasis added). Horne and DeSantis made all kinds of unreasonable and unprecedented demands of Burns, in retaliation for him reporting unlawful conduct. (Burns Decl.). The texts are indicative of Horne's and DeSantis' retaliatory animus toward Burns—they were irritated that Burns agreed to comply with their unreasonable demands because it would make it harder for them to create a justification for his termination.

        In addition to canceling his vacation as noted in the text messages above, Medtronic

---

[5] Significantly, both Horne and DeSantis, who were aware of the obligation to preserve evidence related to Burns' case as early as January 2014, deleted those text messages.

engaged in many other acts of retaliation which create a genuine issue of material fact as to whether Burns' protected activity contributed to his demotion and/or termination.

        **iii.**    **Pretext.** To support their decision to terminate Burns, Defendants claim that they terminated Burns for being insubordinate and failing to follow the directives of management. However, these reasons again are not worthy of belief. And, even if proved to be true, the record evidence suggests that Burns' protected activity tended to affect the decision to terminate him.

        More specifically, DeSantis falsely reported to Human Resources that nearly every one of Burns' co-workers told DeSantis they were in fear of Burns, and made up Burns' potentially violent nature to get Burns fired. DeSantis told HR that he fears Burns and believes Burns has the potential of being physically harmful, and that <u>the same opinion had been shared with him by nearly everyone that works with Burns</u>. (Kersey Decl. Ex. 11). However, this is unsupported by the record evidence. DeSantis could only merely say that Burns' "general attitude" was intimidating, and could not name a single specific example of Burns acting in a threatening manner toward anyone. (Dkt. 113-2, DeSantis 43:8-45:21). He had never heard of Burns being physically violent toward anyone. <u>Id</u>. In fact, DeSantis testified that *actually*, only two people (out of more than 20 in the district) ever told him they were fearful of Burns, and for no other reason than his "general demeanor." (Dkt. 113-2, DeSantis 46:6-13).

        In further efforts to get Burns fired, DeSantis falsely reported to HR that the team of Clinical Specialists was not comfortable working with Burns, "so a change needs to happen." (Kersey Decl. Ex. 11). However, DeSantis could not identify any Clinical Specialist that was uncomfortable working with Burns. (Dkt. 113-2, DeSantis 140:19-141:11). To the contrary,

Joan Zettinger, one of the Clinical Specialists who worked closely with Burns both as a sales representative and as a Clinical Specialist, pleaded with Burns to stay at Medtronic, and wrote him a letter of recommendation when he was fired. (Burns Decl.).

Horne falsely alleged that Burns intentionally changed his voicemail to go to the wrong person, but that is not true. (Dkt. 102-3; Burns Decl.). Horne made the false allegation to drum up reasons to have Burns terminated.

Horne falsely alleged that Burns was not forwarding communications to Jesse Turcott. (Dkt. 102-3; Burns Decl.). Horne also could not name a single instance where any negative result occurred because Burns allegedly failed to forward information to Turcott. (Dkt. 113-5, Horne 175:3-8).

   **iv.**  **Inconsistent Policies**. Defendants' failure to consistently follow their policies and practices as it applied to Burns further suggests that Burns' protected activity contributed to his termination. See Morrison v. Booth, 763 F.2d 1366, 1374 (11th Cir. 1985) ("Departures from normal procedures may be suggestive of discrimination"). For example, Medtronic purposefully sent Burns from Bradenton on assignment to Naples, more than 100 miles away, on three separate occasions in a six-week period to punish Burns for engaging in protected activity. (Burns Decl.). However, DeSantis admitted that this was not typical and "would never happen" and that instead there would be a zone shift where someone much closer to Naples would be assigned to help. (Dkt. 113-2, DeSantis 65:24-66:15; Burns Decl.).

As another example, Horne and DeSantis created inconsistent and tedious "requirements" for Burns that did not apply to anyone else, then falsely accused Burns of deliberately failing to follow those instructions. (Burns Decl.). For instance, DeSantis, who

was Burns' boss at the time, said that they were supposed to use Salesforce.com to schedule appointments. (Dkt. 113-2, DeSantis 83:1-4). But Horne reprimanded Burns for using Salesforce.com (Dkt. 102-3) and said that the district *was not* using it. (Dkt. 113-5, Horne 105:13-106:5). By creating conflicting directives, Horne and DeSantis could allege that Burns was "insubordinate" no matter what he did.

      **v.**    **Comparator Evidence.**  Treating Burns differently than his co-workers further demonstrates that his protected activity contributed to his demotion and/or termination. See Corbin v. Southland Intern. Trucks, 25 F.3d 1545 (11th Cir. 1994) (evidence that older employee engaged in same conduct but younger employee was not discharged, along with evidence that plaintiff was not given opportunity to agree to support changes, was sufficient evidence to avoid summary judgment); Delgado v. Lockheed-Georgia Co., a Div. of Lockheed Corp., 815 F.2d 641 (11th Cir. 1987) (where employer relies on violation of work rule, plaintiff can prove retaliation by showing he did not violate a work rule or by showing other employee not within protected class who engaged in similar violations were treated differently).  For example, Horne and DeSantis said that Burns used Outlook when he should not have. (Dkt. 102-3). While DeSantis said there was a company directive not to use Outlook to schedule appointments starting in or around 2011 (Dkt. 113-2, DeSantis 82:7-83:4), Sales Rep Brian Haworth, one of the very people engaging in the illegal activities to which Burns complained, said that he used Outlook regularly to schedule appointments.  (Dkt. 113-4, Haworth 80:9-82:6; Kersey Decl. Ex. 12).  Haworth also acknowledged that it was typical to schedule appointments through Outlook as well as Salesforce.com and "maybe" even through texts messages. (Dkt. 113-4, Haworth at 20:6-21:11).

Horne and DeSantis also accused Burns of failing to provide Turcott with sufficient information to do his job. But others were not reprimanded for providing the same level of information as Burns. (Dkt. 113-4, Haworth 80:9-82:6 and Kersey Decl. Ex. 12). <u>See</u> <u>Corbin</u> and <u>Delgado</u>, <u>supra</u>.

vi.     **Shifting Reasons.** Defendants now shift one of the reasons they allegedly terminated Burns. An employer's shifting explanations for its actions could demonstrate a contributing factor. <u>See</u> Wallender, 2015 WL 10818741, at *20 (citing <u>Bechtel Construction Co. v. Sec. of Labor</u>, 50 F.3d 926, 935 (11th Cir. 1995) ("The pretextual nature of Bechtel's terminating Nichols is further demonstrated by Bechtel's shifting explanations for its actions."). Initially, Medtronic never claimed at the time of Burns' termination or to OSHA in its position statement that the allegations regarding the bumper stickers had anything to do with Burns' termination (Kersey Decl. Ex. 19). Defendants now claim that the alleged bumper sticker incident also contributed to Burns' termination. Moreover, any allegations related to the bumper sticker issue are false, which is further indicated by the fact that Defendants did not discipline Burns for this incident. (Burns Decl.; Kersey Decl. Ex. 20 at BURNS 000167).

vii.     **Failure to Investigate.** The various times Defendants failed to investigate whether allegations against Burns were true is evidence of retaliatory motive and that Burns' protected activity contributed to his termination. <u>See</u> <u>Mastro v Potomac Elec. Power Co.</u>, 371 U.S. App. D.C. 68 (D.C. Cir. 2006); <u>E.E.O.C. v. Chevron Phillips Chemical Co., LP</u>, 570 F.3d 606, 624-25 (5th Cir. 2009).

When Jesse Turcott alleged that Burns failed to forward him cases on April 25, 2014, Burns said the cases were already on Turcott's schedule. (Dkt. 113-1, Burns 298:12-22).

Turcott said they were not. DeSantis just took Turcott's word for it and made no effort to see whether Burns was correct. (Dkt. 113-2, DeSantis 124:17-125:5). Then DeSantis wrote Burns up for the incident, alleging that Burns' typo was intentional. (Dkt. 113-2, DeSantis 132:7-21; Kersey Decl. Ex. 13).

When Horne and DeSantis said that Burns bullied a co-worker, Jennifer Henuber (Kersey Decl. Ex. 14; Dkt. 113-5, Horne 172:22-174:11; Dkt. 113-2, DeSantis 76:23-77:2), they again failed to investigate it. Horne never spoke to Burns about the allegations. (Dkt. Horne 174:8-11). He sent DeSantis to speak with Burns. Id. But DeSantis admitted he never spoke to Burns to get his side of the story, despite also admitting that his practice was always to get both sides of the story. (DeSantis 178:1-9). Moreover, even if Henuber did make the allegations, they are inadmissible hearsay and false.[6] (Burns Decl.).

For the above reasons, there is sufficient evidence in the record for the trier of fact to reasonably find that Burns' protected activity contributed to his demotion and/or termination.

**E.     Defendants have not shown by clear and convincing evidence that they would have terminated Plaintiff even absent any protected activity.**

Because a trier of factor could conclude that Plaintiff established a prima facie case of SOX retaliation, the burden rests with Defendants to show by *clear and convincing* evidence that they would have terminated Plaintiff absent the protected activity. Van Asdale v. International Game Technology, 577 F.3d 989 (9th Cir. 2009). Notably, Defendants' Motion did not even address this part of the burden shifting analysis. As such, by their own silence, Defendants concede a genuine dispute of material fact exists as to whether Defendants met this

---

[6] See FN 3.

high standard. Notwithstanding, for the reasons outlined above in Section C, a dispute of fact remains as to whether Defendants can meet their burden.

## II.     The record supports a Florida Whistleblower Act claim.

To prove a prima facie case for retaliation under the Florida Private Whistleblower Act ("FWA"), a plaintiff must prove: 1) that he objected to or refused to participate in any activity in which plaintiff reasonably believed to be an illegal activity, policy or practice; 2) he suffered an adverse action; and 3) the adverse employment action was causally linked to his protected activity. Aery v. Wallace Lincoln-Mercury, LLC, 118 So. 3d 904 (Fla. 4th DCA 2013).[7]

"Once the prima facie case of retaliation is established, the employer must proffer a legitimate, non-retaliatory reason for the adverse action[s]". Id. (citations omitted).  Plaintiff then bears the burden to prove that the employer's proffered reason(s) are pretextual. Id.

When viewing the evidence in the light most favorable to Plaintiff, there is sufficient circumstantial evidence for Plaintiff's retaliation claim to survive summary judgment. Evidence of pretext supports an inference of retaliation and precludes summary judgment. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000) (the trier of fact may "infer the ultimate fact of [retaliation] from the falsity of the employer's explanation").

### A.     Plaintiff established a prima face case of retaliation.

There is no dispute that Burns suffered adverse employment actions when Defendants demoted Plaintiff to the Clinical Specialist position in March 2014 and later terminated his

---

[7] Courts (federal and state) interpret FWA claims using the McDonnell Douglas burden shifting standards applied in Title VII retaliation claims. See Castillo v. Roche Laboratories, Inc., 467 Fed. Appx. 859 (11th Cir. 2012) (applying Title VII retaliation law to FWA claims); Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 950 (11th Cir. 2000) (same); Aery, 118 So. 3d at 912-913 (recognizing that FWA retaliation claims are analyzed in the same manner as Title VII retaliation claims).

employment on May 2, 2014. (Dkt. 113-7, Corp Rep. Rich 102:7-16; Dkt. 113-2, DeSantis 156:23-157:5)

### 1.   Burns engaged in statutorily-protected expression as defined under the Act.

*False Claims Act.* Burns objected to performing certain billing practices management expected him, other sales representatives and clinical specialists to engage in which he reasonably believed to be illegal and constituted Medicare fraud in violation of the FCA. (Dkt. 113-1, Burns 37:7-40:24). Specifically, Burns objected that management expected Medtronic employees to fill out superbills for submission to Medicare on behalf of Medtronic's clients, even though the physician did not actually render services constituted Medicare fraud. (Id.).

Defendants argue that Burns cannot establish protected activity because he did not have a reasonable belief that what he objected to violated the FCA. (Dkt. 99 at 14). Defendants' sole support for this contention is that Burns previously filed and withdrew an FCA case based on similar allegations. (Dkt. 99 at 14). The fact that Burns withdrew his prior FCA case and/or that the government did not pursue the case does not mean that Burns' beliefs were not reasonable.[8] Nor does it mean that what Burns' objected to was not unlawful. To the contrary, despite the outcome of his prior FCA claim, and contrary to Defendants' argument, Burns actually believed that the practices to which he disclosed and/or objected to were illegal. (Dkt. 113-1, Burns 98:16-101:14).

Further, the fact that Medtronic investigated Burns' complaints also suggests that Burns' beliefs were reasonable. See Mastro v Potomac Elec. Power Co., 371 U.S. App. D.C.

---

[8] There was never a finding as to whether any violations occurred.

68 (D.C. Cir. 2006); E.E.O.C. v. Chevron Phillips Chemical Co., LP, 570 F.3d 606, 624-25 (5th Cir. 2009). Medtronic's own policies and training further supports that Burns' objections were subjectively reasonable. (Burns Decl.).

Moreover, Burns' beliefs were objectively reasonable. Objective reasonableness is measured against existing substantive law. Clover v. Total System Services, Inc., 176 F.3d 1346 (11th Cir. 1999) (quoting Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1388 n. 2 (11th Cir. 1998) (failure to charge the employee who opposes an employment practice with substantive knowledge of the law "would eviscerate the objective component of our reasonableness inquiry"). The billing practices that Burns objected to, if true, would constitute a violation of the FCA. See U.S. ex rel. Armfield, III v. Gills, No. 8:07-cv-2374-T-27TBM (M.D. Fla. 2010) citing Clausen, 290 F.3d at 1311 (11th Cir. 2002) (seeking reimbursement from Medicare for services that were not rendered as billed, including where the provider did not perform or supervise the services claimed, constitutes a false claim, which "is 'sine qua non' of a False Claims Act violation.").

*Anti-Kickback Statute.* Burns also objected to certain entertainment practices management expected him and other sales representatives to engage that he reasonably believed constituted violations of the Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b) ("AKS"). (Dkt. 113-5, Horne 238:10-239:14; Kersey Decl. Ex. 15; Burns Decl.). Specifically, Burns objected to sales representatives, such as Brian Haworth and Neal Horne, paying for and taking physicians on lavish fishing and skiing trips to incentivize the purchase of Medtronic's products paid for by Medicare. (Id.). If proved true, such conduct would violate the AKS. See U.S. ex rel. Hutcheson, 647 F.3d 377 (allegations that a medical company paid physicians

kickbacks in the form of exorbitant and illicit entertainment expenses, among other practices, stated a claim for a violation of the Anti-Kickback Statute).[9]

Defendants argue that Burns cannot establish protected activity because he did not have a reasonable belief that what he objected to violated the AKS.  Here, again, Burns actually believed that the practices to which he disclosed and/or objected to were illegal.[10] Even more compelling is that Medtronic's own policies support Burns' reasonable belief because it specifically recognizes the illegality of improper activities used to influence customers as violating the AKS. (Kersey Decl. Ex. 2 at p. 22). Medtronic also recognizes that employees paying out of their own pockets to entertain customers would also run afoul of the AKS. (Kersey Decl. Ex. 1 at p. 11; Kersey Decl. Ex. 2 at p. 7).   Further, Medtronic trains its employees to recognize these types of potential violations. (Kersey Decl. Ex. 1, 2, 16, 17).  As such, a dispute of fact remains as to whether Burns reasonably believed what he objected to violated a law, rule or regulation.

> **2.    Plaintiff sufficiently established causal connection and Defendants' Proffered Reasons for Plaintiff's Demotion and Termination are Pretextual.**

This Court construes the causal link element "broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001). There is a genuine dispute that Defendants' decisions to demote and/or terminate Burns was not "completely unrelated" from Burns' preceding series of protected activity.

---

[9] See also United States ex rel. Kroening supra FN 2 ("If a pharmaceutical company knowingly and willfully pays or offers to pay any remuneration to a physician in exchange for the physician prescribing a particular product, it violates the Anti-Kickback Statute.").
[10] See Dkt. 113-1, Burns 10:5-12; 14:16-15:1; 45:10-46:6; 215:14-24; 238:18-239:11.

All that is necessary to avoid summary judgment on the issue of pretext is a showing that there is evidence to cast doubt on the proffered reason such that a reasonable fact finder could conclude the proffered reason is not the real reason for the action. Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997). Evidence of pretext includes anything that tends to show the employer's legitimate non-retaliatory reason should not be believed *or* that, considering all the evidence, a retaliatory reason more likely motivated the decision. Combs, 106 F.3d at 1538; Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 921 (11th Cir. 1993) (stating that, to establish pretext, "plaintiff is not required to introduce evidence beyond that already offered to establish the prima facie claim"). For the reasons discussed in detail in Section I.D, supra, the evidence supports that Defendants' proffered legitimate reasons for demoting and terminating Burns are causally related to Burns' protected activity and are a pretext for retaliation. Wolf v. MWH Constructors, Inc., 34 F. Supp. 3d 1213, 1227 (M.D. Fla. 2014). Therefore, summary judgment must be denied.

## CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests that this Court deny *Defendants' Joint Amended Motion for Summary Judgment and Incorporated Memorandum of Law* in its entirety and grant such other relief as it deems just and proper.

Respectfully submitted,

/s/ Joshua R. Kersey
Cynthia N. Sass
Florida Bar No. 0691320
Yvette D. Everhart
Florida Bar No. 0036960
Joshua R. Kersey
Florida Bar No. 0087578
**SASS LAW FIRM**
601 West Dr. Martin Luther King Jr. Blvd.
Tampa, Florida 33603
Telephone: (813) 251-5599
Facsimile: (813) 259-9797

and

John C. Davis, Esquire
Florida Bar No. 827770
**LAW OFFICE OF JOHN C. DAVIS**
623 Beard Street
Tallahassee, Florida 32306-6321
Phone: (850) 222-4770
Fax: (850) 222-3119
Email:  john@johndavislaw.net

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 16, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Michael R. Whitt, Esquire at MWhitt@RobinsKaplan.com
Jeffrey S. Gleason, Esquire at JGleason@RobinsKaplan.com
Amira A. ElShareif, Esquire at AElShareif@RobinsKaplan.com
Marcos E. Hasbun, Esquire at mhasbun@zuckerman.com

 s/ Joshua R. Kersey
Attorney