# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

JOHN BURNS,

      Plaintiff,

v.                             Case No.  8:15-cv-2330-T17-TBM

MEDTRONIC, INC.;
NEAL HORNE, individually;
MIKE MATHIAS, individually; and
CLAYTON DESANTIS, individually,

      Defendants.

---

## PLAINTIFF'S STATEMENT OF DISPUTED FACTS

1.      Defendants allege that Burns' sales began declining in 2012 and he was ranked last or second to last in his region from 2012 until the time of his demotion. (Kersey Declaration Exhibit 19; Kersey Declaration Exhibit 8 at ¶ 3). That is not true. In Fiscal Year 2012 (May 1, 2011 through April 30, 2012) Burns ranked: 5th out of 7 territories in his District in Revenue (Kersey Declaration Exhibit 21); 4th out of seven territories in his District in Implants (Kersey Declaration Exhibit 22); and 2nd out of seven territories in his District in Unit Sales. (Kersey Declaration Exhibit 21).

2.      In Fiscal Year 2013 (May 1, 2012 through April 30, 2013) Burns ranked: 3rd out of seven territories in his District in Revenue (Kersey Declaration Exhibit 21); 6th out of seven territories in his District in Implants (Kersey Declaration Exhibit 22); and 2nd out of seven territories in his District in Unit Sales. (Kersey Declaration Exhibit 21).

3.      As of February 8, 2013, Burns was ranked 19th out of 512 Sales Reps in the country;[1] 6th of 36 Sales Reps in the Florida Region; and 1st of the seven Sales Reps in his District. (Burns Declaration - MEDTRONIC 0001830). In Q3 of FY 2013 (November 1, 2012 through January 31, 2013), Burns was awarded the "National CRDM Sales Rep of the Quarter" award, which is given to the top ten territories in the nation. (Burns Declaration - MEDTRONIC 1368-1369).

4.      Burns received several other awards for his good performance in hitting his targeted sales during that time period. (Burns Declaration - MEDTRONIC 0000036-39, 0000052-55).

5.      Any decline in Burns' sales after Q3 of FY 2013 was largely due to the fact that one of Medtronic's largest competitors, Boston Scientific, was offering physicians the opportunity to be among the first to obtain a new product that Boston Scientific was releasing, the Watchman Left Atrial Appendage Closure device ("Watchman"), if the physicians would use more Boston Scientific devices. (Dkt. 113-11, Rothfeld 27:23-28:11; 49:6-50:12). Dr. Rothfeld, who was by far the largest cardiac device implanter in Burns' territory, told Neal Horne, Burns' Manager, that the reason he was using more Boston Scientific products was so that he could have an opportunity to get the Watchman device. (Id.). The reason Dr. Rothfeld switched from Medtronic to Boston Scientific had nothing to do with Burns. (Dkt. 113-11, Rothfeld 46:13-16).

6.      Defendants allege that as Burns' sales dropped, Neal Horne began receiving complaints about Burns from Medtronic's physician-customers. But that is not true. (Dkt. 113-1, Burns 22:23-23:7; Burns Declaration).

7.      Defendants allege that one reason Burns was demoted was because the largest customer in Burns' territory, Dr. Jeffrey Rothfeld, complained about him to Neal Horne. (Kersey

---

[1] His territory ranked #16 of #347, but many territories have multiple Sales Reps.

Declaration Exhibit 8 at ¶ 5; Dkt. 113-5, Horne 50:24-51:6; 51:20-52:3; 78:8-79:6). Horne said that Dr. Rothfeld's unhappiness with Burns was the reason that Dr. Rothfeld began switching his business from Medtronic to Boston Scientific. (Dkt. 113-5, Horne 78:8-79:10). Horne said Dr. Rothfeld communicated his complaints about Burns when Horne was in his office introducing Jesse Turcott as the new Sales Rep for the territory. (Dkt. 113-5, Horne 79:16-18). But there is ample evidence to show none of that is true. Essentially, Dr. Rothfeld said that none of Horne's allegations are true. (Dkt. 113-11, Rothfeld 33:1-5).

8.      First, Dr. Rothfeld said he <u>never</u> complained about Burns. (Dkt. 113-11, Rothfeld 33:1-5). In fact, he said he had never heard *anyone* at Bradenton Cardiology Center express a negative opinion of Burns. (Dkt. 113-11, Rothfeld 32:22-25). He said that Burns was "[p]robably the most effective sales rep in the area." (Dkt. 113-11, Rothfeld 44:13-18). Dr. Rothfeld listed a litany of reasons he felt Burns was an effective sales rep including: that he was always on time; that he always knew what the case was before it started; that he "set the standard" in terms of coming in early the next day to check the device; that if you asked Burns to do something, he always followed through; that if you asked Burns a question that he could not answer, he would follow up and get you the answer; that he "just always knew what was going on" and "was very helpful." (Dkt. 113-11, Rothfeld 44:24-46:6). Dr. Rothfeld even wrote Burns a letter of recommendation when Medtronic terminated his employment. (Kersey Declaration Exhibit 9). Second, Dr. Rothfeld said the reason he began switching his business from Medtronic to Boston Scientific "had nothing to do with John [Burns]." (Dkt. 113-11, Rothfeld 46:13-22). Dr. Rothfeld told Horne specifically that the reason he was moving to Boston Scientific was to try to get in a better position to have a chance at getting future Boston Scientific products. (Dkt. 113-11, Rothfeld 27:23-28:11; 49:6-50:11).

9.     Horne also claimed that Dr. Enrique Rivera complained that Burns made inappropriate comments about him to hospital staff. (Kersey Declaration Exhibit 8 at ¶ 5). There is ample evidence to show that this allegation was not part of the reason Medtronic demoted Burns. First, the incident occurred at least six or seven years ago, around 2010, several years before Burns' demotion. (Dkt. 113-1, Burns 26:8-11). Second, when Dr. Rivera spoke to Burns about it, both Burns and the hospital staff explained to Dr. Rivera that the "John" who made the comments was not John Burns, but rather was another John who worked at the hospital. (Dkt. 113-1, Burns 25:19-26:7). Third, Dr. Rivera did not even complain to Horne. Horne allegedly heard Dr. Rivera discussing the incident in a hallway. (Dkt. 113-5, Horne 39:12-40:15). Fourth, Dr. Rivera did not give Medtronic any business anyway, so even if the allegations were true, which they are not, Medtronic did not lose business because of Burns. (Burns Declaration). Fifth, back around 2010 when the incident occurred, Burns also explained to Horne that Dr. Rivera misunderstood, and that it was a different John. (Dkt. 113-5, Horne 40:10-15).   Medtronic, Horne and Mathias never counseled Burns about this alleged complaint or even made Burns aware of the complaint.   Last, since Burns' termination from Medtronic, Burns has had lunch with Dr. Rivera multiple times, Dr. Rivera has expressed interest in using the company Burns works for now, and Dr. Rivera has even requested that Burns nominate him to perform medical studies for Burns' current company. (Burns Declaration). This further negates Defendants claim that Dr. Rivera complained about Burns.

10.     Burns never threatened Dr. Robert Subbiondo, and Horne and Medtronic know that. Dr. Subbiondo asked Burns to have his clinical support staff perform additional services so that he could bill additional charges. (Dkt. 113-1, Burns 225:2-227:1; Burns Declaration). Burns told Dr. Subbiondo that he needed a written order from the doctor to do so. (Dkt. 113-1, Burns 225:2-227:1; Burns Declaration). Dr. Subbiondo repeatedly said to Burns he could "take the pain away"

if it was too much of a pain. (Dkt. 113-1, Burns 225:2-227:1; Burns Declaration). Dr. Subbiondo implied that he would give his business to Burns' competitors if Burns was not willing to do as Dr. Subbiondo asked. (Burns Declaration). Since Burns' departure from Medtronic, Burns has had lunch with Dr. Subbiondo multiple times, and Dr. Subbiondo has indicated he is trying to get Burns business at his new place of employment. (Burns Declaration). This further belies Defendants' stated reasons for Burns' demotion.

11.     Defendants' allegations that Burns engaged in any threatening behavior toward anyone are false. Nobody complained that they were in fear for their safety. (Dkt. 113-2, DeSantis 43:8-45:21; 46:6-13; 140:19-141:11).

12.     In fact, Burns' co-worker Joan Zettinger emailed Burns privately and pleaded with him to stay, noting that she and another Clinical Specialist, Kim French, loved working with Burns. (Burns Declaration - BURNS 00803, BURNS 000989).

13.     The first time Horne met with Burns regarding Burns' demotion was on October 25, 2013 at Blake Hospital. Horne told Burns his options were to take a demotion or quit, and never mentioned anything about Burns' performance or any complaints about Burns from anyone. (Burns Declaration). Horne said the district was restructuring and Burns' and Turcott's territories were being "absorbed". (Burns Declaration).

14.     Horne never said anything to Burns about any complaints about him in November 2013. (Burns Declaration).

15.     Burns did not change his voicemail in February 2014, and as soon as it was pointed out to him that it needed to direct communications to Jesse Turcott, he changed it. (Dkt. 113-1, Burns 277:14-279:1).

16.     Burns did forward customer communications directly to Turcott. (Dkt. 113-1, Burns 227:2-21; 279:2-279:16).

17.     Defendants allege that Burns did not provide Turcott with the information necessary to perform his job properly, but that is not true. Turcott often requested information that was not necessary to complete his job and was not needed by others to understand. (Burns Declaration - MEDTRONIC 2024-25). Defendants do not identify a single time that Turcott was unable to perform his job due to incomplete information. (Burns Declaration). Sometimes Haworth sent Burns incomplete information, but it was not considered "intentional" or "sabotage". (Burns Declaration - MEDTRONIC 0003222). And the amount of information available varies. (Dkt. 113-1, DeSantis 85:10-18). Sometimes the recipient is "lucky" to get a room number from the customer. (Dkt. 113-4, Haworth 81:25-82:5; Kersey Declaration Exhibit 12). Burns even continued to forward communications he received from Medtronic for *years* after Medtronic fired him, when he had absolutely no obligation to do so. (Dkt. 113-4, Haworth 144:5-145:10). Unbelievable, Defendants even allege that Burns was "hindering" them by forwarding those communications. (Id.)

18.     Defendants allege that Burns continued to contact customers without being directed to do so, but they do not provide any specifics as to whom they allege Burns contacted, and Burns testified that it was the customers who were contacting him and that he was forwarding the information. (Dkt. 113-1, Burns 20:1-22:13).

19.     Burns did not bully or intimidate Jennifer Henuber and there is no evidence in the record that he did so, other than DeSantis' and Horne's inadmissible hearsay allegations. (Burns Declaration).

20.     Burns did not put defamatory bumper stickers on physicians' cars.   (Kersey Declaration Exhibit 20).  The email from St. Jude's counsel says that Neal Horne and MDT TSS Rich Merrill confirmed it. (Dkt. 104-2). But Neal Horne could not have confirmed it because he was not there. (Dkt. 113-5, Horne 176:5-178:18; 180:6-20). And the person who told Horne, Tom Rao, said he *thought* Burns had done it. (Dkt. 113-5, Horne 178:9-18). And when Horne reported it to Aarti Gupta in HR he said "if this is true"—not that it *was* true. (Kersey Declaration Exhibit 23). And Horne did not recall ever discussing it with Gupta, and he did not ask Burns whether it was true or have any discussion with Burns about the allegation. (Dkt. 113-5, Horne 181:9-20). Yet, it was later used as a shifting reason for Burns' termination. (Dkt. 99, p. 10). Defendants also have provided no evidence or testimony from Rich Merrill, who no longer works for Medtronic, supporting this allegation. (Dkt. 113-5, Horne 180:21-181:8). As such, the allegations are purely inadmissible hearsay.

21.     Burns did not fail to abide by the expectations of his Clinical Specialist position. (Burns Declaration).

22.     Burns did make specific reports of alleged unlawful conduct prior to January 27, 2014, and he testified that he had done so. (Dkt. 113-1, Burns 22:23-23:12; 35:17-37:6; 311:12-19; Burns Declaration).

23.     Burns did ride motorcycles periodically with Dr. Joe Pace, who owned and rode his own motorcycle, back in the early 2000s. (Dkt. 113-1, Burns 229:2-25). Importantly, Burns did not pay for Dr. Pace's gas. (Id.). Dr. Pace did not ride on Burns' motorcycle. (Id.). Conversely, Brian Haworth told Burns he personally paid for everything, including the gas, for the fishing trips he took doctors on. (Dkt. 113-1, Burns 63:23-67:15). And the doctors did not take their own boat separately, they went on Brian Haworth's fishing boat, an Everglades 290 Pilot, 29 feet long with

twin 250 horsepower motors. (Dkt. 113-4, Haworth 99:3-9; Kersey Declaration Exhibit 24). Burns relied on Haworth telling him that he paid for everything on the trips. (Dkt. 113-1, Burns 63:23-67:15). Moreover, Burns testified that Haworth told him paying for the trips was worth it because he would get business out of it, not because he was personal friends with all the doctors he took fishing and those doctors' family members. (Id.).

24.      Burns did not testify that he does, and did believe that the conduct he complained of violated federal law based on the training Medtronic provided him. (Dkt. 113-1, Burns 7:24-9:13; 10:13-13:4; 14:16-15:1; 105:5-109:11).

25.      Burns never testified that the alleged unlawful conduct he reported was not unlawful. (Dkt. 113-1, Burns 10:5-12; 14:16-15:1; 45:10-46:6; 215:14-24; 238:18-239:11).

26.      Burns did believe that additional substantial fines could have been levied due to the fraud if the government wanted to pursue Medtronic, which could have impacted the shareholders. (Dkt. 113-1, Burns 10:5-12; 14:16-15:1)

Respectfully submitted,

/s/ Joshua R. Kersey
Cynthia N. Sass
Florida Bar No. 0691320
Yvette D. Everhart
Florida Bar No. 0036960
Joshua R. Kersey
Florida Bar No. 0087578
**SASS LAW FIRM**
601 West Dr. Martin Luther King Jr. Blvd.
Tampa, Florida 33603
Telephone: (813) 251-5599
Facsimile: (813) 259-9797

and

John C. Davis, Esquire
Florida Bar No. 827770
**LAW OFFICE OF JOHN C. DAVIS**
623 Beard Street
Tallahassee, Florida 32306-6321
Phone: (850) 222-4770
Fax: (850) 222-3119
Email:  john@johndavislaw.net

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 16th day of June, 2017, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic

filing to the following:

Michael R. Whitt, Esquire at MWhitt@RobinsKaplan.com

Jeffrey S. Gleason, Esquire at JGleason@RobinsKaplan.com

Amira A. ElShareif, Esquire at AElShareif@RobinsKaplan.com

Marcos E. Hasbun, Esquire at mhasbun@zuckerman.com

 s/ Joshua R. Kersey
Attorney